**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 1 to Notice of Removal***

K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled:  Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR CCLD

COUNTY:  **N**  K  S    CIVIL ACTION NUMBER: _____

| | |
|---|---|
| CAPTION:<br><br>ESTATE OF SIDNEY DENNIS, BY ITS PERSONAL REPRESENTATIVE, MAURICE DENNIS,<br><br>PLAINTIFF,<br>V.<br><br>WELLS FARGO BANK, N.A.<br><br>DEFENDANT. | CIVIL CASE CODE: _____ CCLD _____<br><br>CIVIL CASE TYPE: COMPLEX COMMERCIAL LITIGATION DIVISION<br><br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) NO<br><br>NAME AND STATUS OF PARTY FILING DOCUMENT: PLAINTIFF, THE ESTATE OF SIDNEY DENNIS<br><br>DOCUMENT TYPE: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM):<br>COMPLAINT<br><br>JURY DEMAND:  YES ____ NO __X__ |
| Attorney Name(s):<br><br>Kaan Ekiner, Nathan Barillo<br><br>Attorney I.D.(s):<br><br>5607, 5863<br><br>Firm Name:<br><br>Cozen O'Connor<br><br>Address:<br><br>1201 Market Street, Suite 1001<br><br>Wilmington, DE 19801<br><br>Telephone Number:<br>(302) 295-2046<br><br>Fax Number:<br>(302) 250-4356<br><br>Email Address:<br>kekiner@cozen.com, nabrillo@cozen.com | Identify any related cases now pending in the Superior Court or any related cases that have been closed in this court within the last two years by caption and civil action number including judge's initials:<br><br>_____<br><br>_____<br><br>Explain the relationship(s):<br><br>_____<br><br>_____<br><br>_____<br><br>Other unusual issues that affect case management:<br><br>_____<br><br>_____<br><br>_____<br><br>(If additional space is needed, please attach page) |

**The Prothonotary will not process the complaint, answer or first responsive pleading in this matter for service until the case information statement (CIS) is filed.  The failure to file the CIS and have the pleading processed for service may result in the dismissal of the complaint or may result in the answer or first responsive pleading being stricken.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 2 to Notice of Removal***

K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*

EFiled:  Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR CCLD

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis,

        Plaintiff,

v.

WELLS FARGO BANK, N.A.,

        Defendant.

C.A. No. N26C-
(CCLD)

## COMPLAINT

Plaintiff, the Estate of Sidney Dennis, by its Personal Representative, Maurice Dennis (the "Estate" or "Plaintiff"), brings this Complaint against Defendant, Wells Fargo Bank, N.A. ("Wells Fargo"), and in support thereof, alleges as follows.

## INTRODUCTION

1. This action involves a stranger-originated life insurance ("STOLI") policy, which, upon information and belief, was manufactured in and under Delaware law on the life of Sidney Dennis (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

2. The Policy was originated and procured by a family of interrelated Delaware entities known generally as Coventry, which operated a STOLI program that generated large numbers of multi-million dollar STOLI policies, including the Policy here.

3.      Mr. Dennis (the "Insured") has now passed away, and the death benefits of the Policy have been paid by the life insurer to Wells Fargo as the record owner and beneficiary of the Policy.

4.      However, according to Delaware's long-standing common law, as clearly codified by Delaware statute, and as confirmed recently by multiple courts, including the Delaware Supreme Court, the Estate is entitled to require Wells Fargo to disgorge to the Estate the Policy death benefits that were paid to it, together with substantial pre-judgment interest. *See* 18 *Del. C.* § 2704(b); *Estate of Barotz v. Vida Longevity Fund*, 2022 WL 16833545, at *12-13 (Del. Super. Ct. Nov. 9, 2022) ("*Estate of Barotz*") (granting summary judgment for estate of insured on policy lacking insurable interest and awarding death benefit and interest to the estate), *aff'd*, 320 A.3d 212 (Del. 2024); *Lavastone Capital v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Estate of Berland I*") (addressing certified questions and confirming that "if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient"); *Estate of Berland v. Lavastone Capital*, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Estate of Berland II*") (on remand, district court awarding, on summary judgment, the policy's death benefit to family of insured, plus substantial pre-judgment interest); *see also Estate of Malkin v. Wells Fargo Bank*, 998 F.3d 1186 (11th Cir. 2021) ("*Estate of Malkin II*") (affirming district court decision

2

finding on summary judgment that identically-procured Coventry policy was a void *ab initio* human life wager, and certifying remaining questions to the Delaware Supreme Court, which confirmed that estate of insured was entitled to policy proceeds, in *Wells Fargo Bank v. Estate of Malkin*, 278 A.3d 53 (Del. 2022) ("*Malkin*")).

**PARTIES**

5.      Sidney Dennis was a citizen of Florida at the time of his death, and the Estate is a citizen of Florida. Mr. Dennis's son, Maurice Dennis, was appointed by a Florida probate court to serve as Personal Representative of the Estate.

6.      Defendant Wells Fargo is a national banking association organized and existing under federal law with its main office located in South Dakota. Wells Fargo is named as a party to this action because, as set forth below, it was the owner and beneficiary of the Policy and received the Policy death benefits from the insurance company that issued it.

**JURISDICTION AND VENUE**

7.      This Court has subject-matter jurisdiction under Article IV, § 7 of the Delaware Constitution, 10 *Del. C.* § 541, and 10 *Del. C.* § 6501, *et seq.*, because there is an actual controversy between the parties and such controversy is ripe.

8.      Venue is proper in the Superior Court of Delaware because, as set out in further detail below, this litigation concerns the issuance of a Delaware life

3

insurance policy that, upon information and belief, was applied for via an application that was signed in Delaware, and the Policy was delivered to a Delaware trust in Delaware.

9.     There is an actual controversy between the parties, which is ripe for judicial resolution. The Policy at issue in this case was an illegal human life wager that is void *ab initio* and lacks an insurable interest under the applicable law.

10.     The parties therefore have an actual controversy over whether the Policy was void *ab initio* and whether, under applicable law, the Estate is entitled to the death benefits paid on the Policy.

11.     This Court has personal jurisdiction over Wells Fargo because, among other things, the Estate's cause of action arises out of Wells Fargo's transaction of business in Delaware and its contracts to supply services in Delaware, including Wells Fargo's role in connection with the Wells Fargo Origination Agreements (defined below). *See* 10 Del. C. § 3104(c)(1), (2).

12.     This Court has personal jurisdiction over Wells Fargo because Wells Fargo caused injury in Delaware when Wells Fargo claimed and received the death benefits of a STOLI policy—acts that constitute "a violation of Article II, Section 17 of Delaware['s] Constitution and of the State's public policy." *Malkin*, 278 A.3d at 65; *See* 10 Del. C. § 3104(c)(3).

13.     This Court has personal jurisdiction over Wells Fargo because Wells Fargo derives substantial revenue from the banking services, including from STOLI-related banking services, it provides in Delaware. *See* 10 Del. C. § 3104(c)(4).

14.     This Court also has specific personal jurisdiction over Wells Fargo through Delaware's "conspiracy theory" of personal jurisdiction, under which conspirators absent from the state are nevertheless subject to specific personal jurisdiction in Delaware where: (i) a conspiracy to defraud existed; (ii) the defendant was a member of that conspiracy; (iii) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (iv) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (v) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982); *Chanlder v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003).

15.     Here, the Policy was procured through Coventry's Delaware-centered STOLI scheme. As explained in further detail herein—Wells Fargo and others—were knowing and active participants in this conspiracy, having joined in, sustained, and benefited from the STOLI scheme. Further, as confirmed multiple times by the

5

Delaware Supreme Court, STOLI is, among other things, a "fraud on the court." *Malkin*, 278 A.3d at 56.

16. Wells Fargo knew that the Policy was procured and administered through a Delaware-centered STOLI scheme, and that by acquiring the Policy and/or the purported rights to the Policy's death benefit, it was joining a conspiracy, and that its actions would directly affect Delaware's interests by wagering on human life in violation of Delaware's Constitution, statutes, and public policy. The harm to Delaware and the Estate was a direct and foreseeable consequence of Wells Fargo's participation in and perpetuation of this Delaware-based STOLI conspiracy. Wells Fargo's decision to collect and receive illegal STOLI death benefits was a violation of the Delaware Constitution that was directed at and felt in Delaware. Wells Fargo's request for and collection of the STOLI death benefits was the culmination of the original conspiracy to circumvent and violate Delaware's insurable interest laws and the culmination of the original wager on Mr. Dennis's life.

17. Assignment to the Complex Commercial Litigation Division is appropriate because the amount in controversy exceeds $1,000,000.

## BACKGROUND

18. This action concerns a life insurance policy controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 *Del. C.* §

6

2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." § 2704(e)(4). The Delaware insurable interest statute further provides that a Delaware trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." § 2704(e)(4), (g). Notably, here, on information and belief, the Policy was issued for delivery to the Sidney Dennis Family Insurance Trust, a Delaware statutory trust, in Delaware, and on information and belief, was signed for by Wilmington Trust Company ("Wilmington Trust") as trustee, which has (and had) its principal place of business in Delaware.

19.     As the Delaware Supreme Court has recognized: "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured by entities lacking insurable interest in the life of the insured violate Delaware's insurable interest requirement and public policy. *Id.*

20.     Although speculators have existed for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than recently. In the early 2000s, institutional investors began pooling

7

large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

21.    It is well established, however, that when this was happening in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high-face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

22.    One such STOLI promoter was a family of interrelated Delaware entities known generally as "Coventry," which operated a large, Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained further below, Coventry operated what has come to be called a "back-end" STOLI scheme using non-recourse premium financing.

23.    Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior

citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

24.    The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as a "risk-free" opportunity, "just a good deal," and similar to "hitting the lottery" or getting "bingo."

25.    The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities, including that the policies at issue were procured by third parties without an insurable interest in the insureds.

26.    STOLI policies violate insurable interest laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of insureds with a genuine need for protection—into cash machines for strangers to the insureds who are more interested in seeing them dead than alive.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

27.    The role of Coventry, Wells Fargo, and U.S. Bank in connection with the origination, maintenance, and/or maturation of the Policy dates back many years.

28.    Beginning in 2001, Coventry, U.S. Bank, and Lavastone Capital LLC (which was formerly known as AIG Life Settlements LLC and is referred to herein

as "Lavastone") entered into a series of requirements contracts through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with U.S. Bank serving in various roles, including as trustee, fiscal agent, and/or securities intermediary (the "U.S. Bank Origination Agreements").[1] Beginning in or about 2008, Coventry, Wells Fargo, and Lavastone entered into a series of requirements contracts that were effectively identical to the U.S. Bank Origination Agreements and through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with Wells Fargo serving in various roles including as trustee, fiscal agent, and/or securities intermediary (the "Wells Fargo Origination Agreements").

29.    More specifically, pursuant to the U.S. Bank Origination Agreements and the Wells Fargo Origination Agreements (collectively, the "Origination Agreements") and related contracts, Coventry, as the "Originator," was obligated to create large numbers of life insurance policies that (subject to certain exceptions that rarely applied) Lavastone was required to purchase from Coventry. Lavastone's purchase from Coventry would, in all or virtually all cases, be facilitated by U.S.

---

[1] Lavastone is an affiliate of the American International Group (often referred to as "AIG").

10

Bank or Wells Fargo, which served in many different roles, including as trustee of various trusts and/or as fiscal agent, and as securities intermediary for Coventry, Lavastone, and other investors.

30.    To manufacture such life insurance policies intended for transfer on the secondary life insurance market, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would procure on each insured's life.

31.    Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carriers, thus further adding to Coventry's financial incentive to originate new life insurance policies.

32.    Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the maintenance of the policies or even the "liquidation" of the policies.

11

33.     Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. In many cases, if not all, these life expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was a Coventry "Approved Underwriter" as defined by the Origination Agreements between Coventry, Lavastone, and U.S. Bank or Wells Fargo.

34.     Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how profitable to Coventry and its cohorts a particular policy (if procured) might be.

35.     Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of the local insurance brokers, would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

36.     Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would then create and fund (sometimes with no more than a single dollar) a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential

12

policy on an insured's life. Coventry would create and fund each Delaware trust by directing the local insurance broker to have the insured execute a number of boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with $1.00. The Delaware trusts would have no other assets, and would be established by and for Coventry, and typically were expressly not intended to serve any valid estate planning need for the insureds.

37.     Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy procured by Coventry through the Delaware trusts, on the insured's life.

38.     With regard to all of the Delaware trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

13

39.    Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

40.    The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts (i.e., the Origination Agreements) under which it was engaged (indeed required) to "originate" life insurance policies for resale to other investors.

41.    The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the

14

terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

42.    Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

43.    But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware Trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to Lavastone pursuant to the Origination Agreements (which, on information and belief, is what occurred in the majority of Coventry's transactions) and Lavastone would either hold the policy until maturity or resell it to another investor. Alternatively, the policy in question could be sold to Coventry for

an amount in excess of the loan balance (and then sold by Coventry to Lavastone pursuant to the Origination Agreements) or sold to a third-party for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, the thousands of policies originated by the Coventry through the Origination Agreements ended up, in almost all instances, on the secondary life insurance market, just as intended, and usually with Coventry (and then Lavastone and then others) as the investors, with U.S. Bank or Wells Fargo as the record owners and beneficiaries, and with the investors either keeping the policies until maturity or reselling them to yet other investors.

44.    Coventry and others were often also engaged by Lavastone or other investors to "service" each policy until the insured died, which required that Coventry or these others pay ongoing policy premiums on behalf of the policy's actual owner, and Coventry or these others would contact the insured or their family on a regular basis to confirm whether the insured had died yet. Once Coventry or these others learned an insured had died, they would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

45.    Every court that has considered Coventry's scheme under Delaware law has held, as a matter of law, that: (i) the Coventry program was a STOLI program; and (ii) policies produced by the program are void *ab initio*. *See, e.g.*, *Estate of Barotz*, 320 A.3d 212 (affirming grant of summary judgment for estate of

16

insured on Coventry STOLI policy lacking insurable interest and awarding death benefit and interest to the estate), *aff'g* 2022 WL 16833545; *Estate of Daher v. LSH*, 2024 WL 3571642, at *3 (C.D. Cal. July 23, 2024) (declaring Coventry policy void *ab initio* on summary judgment under Delaware law); *U.S. Bank v. Estate of Albart*, 2023 WL 7491131 (Fla. 5th Cir. Ct. Oct. 23, 2023) ("*Estate of Albart*") (same); *Estate of Diamond v. U.S. Bank*, 2023 WL 6392688 (Fla. 15th Cir. Ct. Sept. 15, 2023) ("*Estate of Diamond*") (same); *Estate of Berland II*, 2022 WL 15023450 (same); *Estate of Malkin v. Wells Fargo Bank*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019) ("*Estate of Malkin I*") (same); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601 (D. Del. 2019) (same); *U.S. Bank v. Sun Life*, 2016 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted* 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (same); *Sun Life v. U.S. Bank*, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd* 693 F. App'x 838 (11th Cir. 2017) (same).

46.      On November 16, 2021, in *Estate of Berland I*, the Delaware Supreme Court issued a unanimous *en banc* decision, which involved certified questions of law arising out of a Coventry-procured life insurance policy. 266 A.3d at 970-74. In that decision, the Delaware Supreme Court held that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force." *Id*. at 968 (quoting *Price Dawe*, 28 A.3d at 1065).

17

47.     In so holding, the Delaware Supreme Court reaffirmed its prior unanimous, *en banc* decision in *Price Dawe*, which held, *inter alia*, that Delaware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can "never" be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 28 A.3d at 1068 n.25, 1071.

48.     In *Estate of Berland I*, the Delaware Supreme Court also confirmed that, when a life insurance company pays on a STOLI policy that lacks an insurable interest, then the estate of the insured is entitled to sue the payee to require disgorgement of the policy proceeds, plus substantial prejudgment interest. 266 A.3d at 970-74; *see also Estate of Berland II*, 2022 WL 15023450.

49.     On May 26, 2022, after the Eleventh Circuit certified questions in *Estate of Malkin*, the Delaware Supreme Court, in yet another unanimous *en banc* decision, confirmed that, if a life insurance policy governed by Delaware law (like the Coventry policy at issue in *Estate of Malkin*) is deemed to be a void *ab initio* human life wager, whatever policy proceeds were paid must be disgorged to the estate of the insured as a matter of Delaware's "longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit," pursuant to Section 2704(b) of Delaware's

18

insurable interest statute, which codified that common law cause of action and provides:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

*Malkin*, 278 A.3d at 60-61 (*quoting* Section 2704(b)).

50.    The Delaware Supreme Court further held, *inter alia*, that various UCC defenses do not apply in the context of insurable interest claims, and further explained that a defendant in such a case is allowed to obtain a credit for premiums only under limited circumstances. *Id.* at 56, 60, 63-67; *see also Estate of Barotz*, 320 A.3d 212 (Delaware Supreme Court affirming award of death benefit, plus interest, to estate where policy procured through Coventry program).

### The Application and Issuance of the Policy

51.    In or around 2005, Transamerica Life Insurance Company ("Transamerica") received an application for life insurance (the "Application") seeking a life insurance policy on the life of Mr. Dennis, who was then 78 years old.

52.    The Application identified the owner and beneficiary of the proposed policy as the Trust, a Delaware statutory trust formed under Delaware law, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890.

19

53.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Application was executed by an officer for the Trust's trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office, as owner and beneficiary of the Policy.

54.    In reliance upon the representations contained in the Application, and other documents and information submitted to Transamerica in connection with the Application, Transamerica issued the Policy bearing policy number 60130474.

55.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Transamerica received a delivery receipt for the Policy executed by an officer for the Trust's trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office.

### The Policy Lacked Insurable Interest and Was Procured Illegally on Mr. Dennis's Life

56.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy lacked an insurable interest at its inception, and was procured on the life of Mr. Dennis as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional, statutory, and common law prohibitions. Any appearance of insurable interest was superficial only.

57.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry (or third parties lacking an insurable interest in the Insured's life) paid the Policy's premiums; and, as will likely have

evidentiary support after a reasonable opportunity for further investigation or discovery, neither the Insured nor anyone else with an insurable interest in his life paid the premiums or were at risk that their funds would be used to pay the premiums.

58.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, to induce the Insured to allow the Policy to be procured on his life, Coventry and those acting on its behalf may have represented that the Policy was being procured through legitimate and legal transactions, or further induced the Insured with the promise of financial compensation if he permitted the Policy to be procured.

59.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry acted through its agent(s) to have the Application for the Policy submitted to Transamerica.

60.    To facilitate these transactions, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry created the Trust as a Delaware trust, installed Wilmington Trust as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

61.    The Trust was a sham and used as a cover because, as will likely have evidentiary support after a reasonable opportunity for further investigation or

21

discovery, it was nominally funded and created as a means to conceal from the insurance carrier the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trust lacked any valid insurable interest in the Insured's life.

62.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry further created a sub-trust to the Trust. The sub-trust was also established as a mere cover to procure the Policy without a valid insurable interest.

63.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy was issued for delivery in Delaware to the Trust and was delivered in Delaware to the Trust, as described above.

64.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

65.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purported "loan" was secured solely by a security interest in the Trust and sub-trust that held the Policy.

22

66.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, as a result of the purported "loan," neither the Insured nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the loan was used to conceal from the insurance carrier the fact that such premiums were paid by Coventry for the purpose of creating wagers on the Insured's life.

67.    Moreover, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purpose of the Policy was not to provide estate protection for the Insured, but rather, the Insured was used as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on the Insured's early demise.

68.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, approximately two years after the Policy was issued, stranger investors unrelated to Mr. Dennis took formal control of the Policy.

69.    From the start of its involvement with the Wells Fargo Origination Agreements, Wells Fargo has known that it was participating in a STOLI operation in violation of Delaware law.

70.    From the start of its involvement with the Policy at issue here, Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable

23

interest. Yet, Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

71. As noted, since 2011, when the Delaware Supreme Court issued its *Price Dawe* decision, which outlawed STOLI under Delaware law, Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable interest. Yet, Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

72. And since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. However, since at least 2016—before the Insured passed away and Wells Fargo sought the Policy's death benefits here—Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable interest. Yet Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

73. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in a conspiracy to effectuate an illegal STOLI transaction in violation of Delaware law, Wells Fargo, its principals or agents, and/or others working in concert with it, repeatedly invaded the Insured's privacy and that of his family by contacting the Insured and his family frequently to determine whether he was still alive and, if so, to check on the status of his health.

24

74.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in a conspiracy to effectuate an illegal STOLI transaction in violation of Delaware law, Wells Fargo, its principals or agents, and/or others working in concert with it further invaded the Insured's privacy by procuring the Insured's confidential medical records on a regular basis, and then providing those records to third parties to obtain up-to-date life-expectancy reports so as to assess the current value of its wager, as well as to allow potential purchasers to assess the value of the Policy based on when these strangers believed the Insured would die.

75.    Multiple state insurance departments have condemned STOLI schemes as offending senior citizens' human dignity and as subjecting the straw insureds to various other harms, including the violation of their privacy through intrusive contact like that described above, and by misusing their private medical information to maximize their bets on the insureds' lives.

76.    On March 17, 2024, Mr. Dennis passed away.

77.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Transamerica subsequently received claims for the Policy's death benefits by or on behalf of Wells Fargo, and thereafter paid the Policy's death benefits to Wells Fargo accordingly.

## COUNT I

25

## RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

78.    The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

79.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Application identified the owner and beneficiary of the proposed policy as the Trust, a Delaware statutory trust formed under Delaware law and with a Delaware-based trustee. The Policy was then issued to and actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. For these and other reasons, the Policy is governed by Delaware law. 18 *Del. C.* § 2704(e)(4), (g).

80.    For the reasons set forth above, the Policy lacks an insurable interest. *Price Dawe*, 28 A.3d 1059; *Estate of Berland I*, 266 A.3d 964.

81.    Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or other payee that received the benefits as a matter of common law and statute. 18 *Del. C.* § 2704 (b). *See, e.g., Estate of Berland I*, 266 A.3d 964; *Estate of Malkin I*, 379 F. Supp. 3d 1263.

82.    The Policy death benefits were paid, transferred, or otherwise assigned to Wells Fargo, its principals or agents, or others working in concert with them.

26

83.    As a consequence, the Estate is entitled to recover the death benefits (plus applicable interest, attorneys' fees, and other costs and damages) from or through Wells Fargo.

## PRAYER FOR RELIEF

WHEREFORE, the Estate respectfully requests that this Court enter judgment against Wells Fargo in an amount equal to the amount of the death benefits received plus pre-judgment interest, costs, attorneys' fees, and any such other relief as the Court deems just and proper.

**COZEN O'CONNOR**

Dated: January 12, 2026

*/s/ Nathan D. Barillo*
Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

*Attorneys for Plaintiff,*
*The Estate of Sidney Dennis*

27

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |


***Exhibit 3 to Notice of Removal***



K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*

EFiled:  Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR CCLD

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis, | C.A. No. |
| Plaintiff, | |
| v. | **Service Pursuant to 10 *Del. C.* § 3104** |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

## <u>PRAECIPE</u>

TO:   Office of the Prothonotary
Superior Court of Delaware
New Castle County Courthouse
500 North King Street
Wilmington, DE 19801

Please issue a Summons in the form attached hereto for service of process on Defendant, Wells Fargo Bank, N.A., pursuant to 10 *Del. C.* § 3104. Plaintiff's counsel will serve the Summons and Complaint upon Defendant, Wells Fargo Bank N.A., by certified mail, return receipt requested, by serving it at the following address:

Wells Fargo Bank, N.A.
101 North Phillips Avenue
Sioux Falls, SD 57104

**COZEN O'CONNOR**

Dated: January 12, 2026

*/s/ Nathan D. Barillo*
Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

*Attorneys for Plaintiff,*
*The Estate of Sidney Dennis*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 4 to Notice of Removal***

K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*

EFiled: Jan 15 2026 10:54AM EST
Transaction ID 78215245
Case No. N26C-01-263 SKR CCLD

EFiled: Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR CCLD

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis,<br><br>          Plaintiff,<br><br>      v.<br><br>WELLS FARGO BANK, N.A.,<br><br>          Defendant. | C.A. No.<br><br>**Service Pursuant to 10 *Del. C.* § 3104** |

### SUMMONS

**TO PLAINTIFF'S COUNSEL**

**YOU ARE COMMANDED:**

To summon the above-named Defendant, Wells Fargo Bank, N.A., so that, within 20 days of notice, Defendant shall serve upon Kaan Ekiner, Esquire, Plaintiff's attorney, whose address is Cozen O'Connor, 1201 N. Market Street, Suite 1001, Wilmington, DE 19801, an Answer to the Complaint (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense).

To serve upon the Defendant a copy hereof and of the complaint.

Dated: 1-15-26

**COLLEEN REDMOND**
Prothonotary

Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an Answer to the Complaint, (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint.

**COLLEEN REDMOND**
Prothonotary

Per Deputy

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 5 to Notice of Removal***


K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*

EFiled:  Jan 26 2026 03:53PM EST
Transaction ID 78291554
Case No. N26C-01-263 SKR CCLD

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

ESTATE OF SIDNEY DENNIS, by Its
Personal Representative, Maurice
Dennis,

        Plaintiff,

        v.

WELLS FARGO BANK, N.A.,

        Defendant.

C.A. No. N26C-01-263 (SKR)
CCLD

**Service Pursuant to 10 *Del. C.* § 3104**

## ALIAS PRAECIPE

TO:   Office of the Prothonotary
       Superior Court of Delaware
       New Castle County Courthouse
       500 North King Street
       Wilmington, DE 19801

Please issue a Summons in the form attached hereto for service of process on

Defendant, Wells Fargo Bank, N.A., pursuant to 10 *Del. C.* § 3104. Plaintiff's

counsel will serve the Summons and Complaint upon Defendant, Wells Fargo Bank

N.A., by certified mail, return receipt requested, by serving it at the following

address:

       Wells Fargo Bank, N.A.
       3201 N. 4th Avenue
       Sioux Falls, SD 57104

**COZEN O'CONNOR**

Dated: January 26, 2026

*/s/ Nathan D. Barillo*
Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

*Attorneys for Plaintiff,*
*The Estate of Sidney Dennis*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 6 to Notice of Removal***

K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                              *Attorneys for Wells Fargo Bank, N.A.*

EFiled: Jan 26 2026 03:53PM EST
Transaction ID 78291554
Case No. N26C-01-263 SKR CCLD

**IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE**

|  |  |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis,<br><br>          Plaintiff,<br><br>      v.<br><br>WELLS FARGO BANK, N.A.,<br><br>          Defendant. | C.A. No. N26C-01-263 (SKR) CCLD<br><br>**Service Pursuant to 10 _Del. C._ § 3104** |

**ALIAS SUMMONS**

**TO PLAINTIFF'S COUNSEL**
**YOU ARE COMMANDED:**

To summon the above-named Defendant, Wells Fargo Bank, N.A. at 3201 N. 4th Avenue, Sioux Falls, SD 57104, so that, within 20 days of notice, Defendant shall serve upon Kaan Ekiner, Esquire, Plaintiff's attorney, whose address is Cozen O'Connor, 1201 N. Market Street, Suite 1001, Wilmington, DE 19801, an Answer to the Complaint (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense).

To serve upon the Defendant a copy hereof and of the complaint.

Dated:                        **COLLEEN REDMOND**
                                      Prothonotary

                                        Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an Answer to the Complaint, (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint.

Dated:                 **COLLEEN REDMOND** _____

                                      Prothonotary

_____

Per Deputy

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 7 to Notice of Removal***


K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*

EFiled:  Feb 02 2026 01:03PM EST
Transaction ID 78360970
Case No. N26C-01-263 SKR CCLD

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

ESTATE OF SIDNEY DENNIS, by Its
Personal Representative, Maurice
Dennis,

          Plaintiff,

v.

WELLS FARGO BANK, N.A.,

          Defendant.

C.A. No. N26C-01-263 (SKR)
CCLD

## AFFIDAVIT OF SERVICE

STATE OF DELAWARE    )
                    ) ss.
COUNTY OF NEW CASTLE  )

Nathan D. Barillo, Esquire, being duly sworn, deposes and says:

1.    I am a member in good standing of the Bar of the State of Delaware and counsel at the law firm of Cozen O'Connor, counsel for the Estate of Sidney Dennis, by Its Personal Representative, Maurice Dennis ("Plaintiff"), in the above-captioned matter. I am of legal age and competent to testify as to the matters set forth herein.

2.    On January 15, 2026, I caused a copy of Plaintiff's Complaint and Summons to be served via U.S. Certified Mail, Return Receipt Requested on Defendant Wells Fargo Bank, N.A.

3.    On February 2, 2026, I received the Domestic Return Receipt signed on behalf of Defendant Wells Fargo Bank, N.A., confirming delivery and receipt of

Case 1:26-cv-00132-GBW   Document 1-1   Filed 02/04/26   Page 45 of 120 PageID #: 48

the aforementioned Complaint and Summons.  A copy of the Summons, Certified

Mail Receipt and Domestic Return Receipt is attached hereto as Exhibit A.

**COZEN O'CONNOR**

Dated: February 2, 2026

Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2048
nbarillo@cozen.com

*Counsel to Plaintiff*

SWORN AND SUBSCRIBED before me this 2ND day of February, 2026.

Notary Public

My Commission Expires: _____

JODI M. GENNUSA
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires June 23, 2029

2

**EFiled:  Feb 02 2026 01:03PM EST**
**Transaction ID 78360970**
**Case No. N26C-01-263 SKR CCLD**

# EXHIBIT A



EFiled: Jan 15 2026 10:54AM EST
Transaction ID 78215245
Case No. N26C-01-263 SKR CCLD

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO BANK, N.A., <br><br> Defendant. | C.A. No. <br><br> **Service Pursuant to 10 _Del. C._ § 3104** |

### SUMMONS

**TO PLAINTIFF'S COUNSEL**

**YOU ARE COMMANDED:**

To summon the above-named Defendant, Wells Fargo Bank, N.A., so that, within 20 days of notice, Defendant shall serve upon Kaan Ekiner, Esquire, Plaintiff's attorney, whose address is Cozen O'Connor, 1201 N. Market Street, Suite 1001, Wilmington, DE 19801, an Answer to the Complaint (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense).

To serve upon the Defendant a copy hereof and of the complaint.

Dated: 1-15-26

**COLLEEN REDMOND**
Prothonotary

_Cynthia Coleman_
Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an Answer to the Complaint, (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint.

**COLLEEN REDMOND**
Prothonotary

Per Deputy

2



U.S. Postal Service™
CERTIFIED MAIL® RECEIPT
Domestic Mail Only

Cozen 911196

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

Certified Mail Fee
$
Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $
Postage
$
Total Postage and
$ 12.14
Sent To
Street and Apt. No.
City, State, ZIP+4

Wells Fargo Bank, N.A.
101 North Phillips Avenue
Sioux Falls, SD 57104

PS Form 3800,

Postmark Here   JAN 15 2026

RODNEY SQUARE POST OFFICE
500 DELAWARE AVE STE 1 WILMINGTON DELAWARE 19801



**USPS TRACKING #**

9590 9402 9682 5199 9063 78

**United States Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Nathan Barillo
1201 N. Market St.
Suite 1001
Wilmington DE 19801



**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Wells Fargo Bank, N.A.
101 North Phillips Avenue
Sioux Falls, SD 57104

9590 9402 9682 5199 9063 78

2. Article Number (Transfer from service label)

9589 0710 5270 2684 3641 54

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____   ☑ Agent   ☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

1-21-2026

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ ...cted Delivery

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 8 to Notice of Removal***

K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*

EFiled: Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR

**IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE**

| | |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis, | C.A. No. |
| Plaintiff, | |
| v. | **Service Pursuant to 10 *Del. C.* § 3104** |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

## PRAECIPE

TO:   Office of the Prothonotary
Superior Court of Delaware
New Castle County Courthouse
500 North King Street
Wilmington, DE 19801

Please issue a Summons in the form attached hereto for service of process on Defendant, Wells Fargo Bank, N.A., pursuant to 10 *Del. C.* § 3104. Plaintiff's counsel will serve the Summons and Complaint upon Defendant, Wells Fargo Bank N.A., by certified mail, return receipt requested, by serving it at the following address:

Wells Fargo Bank, N.A.
101 North Phillips Avenue
Sioux Falls, SD 57104

**COZEN O'CONNOR**

Dated: January 12, 2026

*/s/ Nathan D. Barillo*
Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

*Attorneys for Plaintiff,*
*The Estate of Sidney Dennis*

2

EFiled: Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis,<br><br>     Plaintiff,<br><br>  v.<br><br>WELLS FARGO BANK, N.A.,<br><br>     Defendant. | C.A. No.<br><br>**Service Pursuant to 10 *Del. C.* § 3104** |

## SUMMONS

**TO PLAINTIFF'S COUNSEL**

**YOU ARE COMMANDED:**

To summon the above-named Defendant, Wells Fargo Bank, N.A., so that, within 20 days of notice, Defendant shall serve upon Kaan Ekiner, Esquire, Plaintiff's attorney, whose address is Cozen O'Connor, 1201 N. Market Street, Suite 1001, Wilmington, DE 19801, an Answer to the Complaint (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense).

To serve upon the Defendant a copy hereof and of the complaint.

Dated:        **COLLEEN REDMOND**
            Prothonotary


            Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an Answer to the Complaint, (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint.

Dated:                                    **COLLEEN REDMOND**
                                          Prothonotary


                                          _____

                                          Per Deputy

2

SUPERIOR COURT EFiled: Jan 12 2026 04:06PM EST
CIVIL CASE INFORMATION STATEMENT (CIS) Transaction ID 78184987
Case No. N26C-01-263 SKR

COUNTY:   <u>N</u>   K   S      CIVIL ACTION NUMBER: _____

| CAPTION:<br><br>ESTATE OF SIDNEY DENNIS, BY ITS PERSONAL REPRESENTATIVE, MAURICE DENNIS,<br><br>        PLAINTIFF,<br>V.<br><br>WELLS FARGO BANK, N.A.<br><br>        DEFENDANT. | CIVIL CASE CODE: _____CCLD_____<br><br>CIVIL CASE TYPE: <u>COMPLEX COMMERCIAL LITIGATION DIVISION</u><br>          (SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) <u>NO</u><br><br>NAME AND STATUS OF PARTY FILING DOCUMENT:<br><u>PLAINTIFF, THE ESTATE OF SIDNEY DENNIS</u><br><br>DOCUMENT TYPE: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM):<br><u>COMPLAINT</u><br><br>JURY DEMAND:  YES    NO  <u>X</u> |
|---|---|
| Attorney Name(s):<br><br><u>Kaan Ekiner, Nathan Barillo</u><br><br>Attorney I.D.(s):<br><br><u>5607, 5863</u><br><br>Firm Name:<br><br><u>Cozen O'Connor</u><br><br>Address:<br><br><u>1201 Market Street, Suite 1001</u><br><br><u>Wilmington, DE 19801</u><br><br>Telephone Number:<br><u>(302) 295-2046</u><br><br>Fax Number:<br><u>(302) 250-4356</u><br><br>Email Address:<br><u>kekiner@cozen.com, nabrillo@cozen.com</u> | Identify any related cases now pending in the Superior Court or any related cases that have been closed in this court within the last two years by caption and civil action number including judge's initials:<br><br>_____<br><br>_____<br><br>Explain the relationship(s):<br><br>_____<br><br>_____<br><br>_____<br><br>Other unusual issues that affect case management:<br><br>_____<br><br>_____<br><br>_____<br><br>(If additional space is needed, please attach page) |

**The Prothonotary will not process the complaint, answer or first responsive pleading in this matter for service until the case information statement (CIS) is filed. The failure to file the CIS and have the pleading processed for service may result in the dismissal of the complaint or may result in the answer or first responsive pleading being stricken.**



EFiled:  Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis,<br><br>                    Plaintiff,<br><br>    v.<br><br>WELLS FARGO BANK, N.A.,<br><br>                Defendant. | C.A. No. N26C-<br>(CCLD) |

### COMPLAINT

Plaintiff, the Estate of Sidney Dennis, by its Personal Representative, Maurice Dennis (the "Estate" or "Plaintiff"), brings this Complaint against Defendant, Wells Fargo Bank, N.A. ("Wells Fargo"), and in support thereof, alleges as follows.

### INTRODUCTION

1. This action involves a stranger-originated life insurance ("STOLI") policy, which, upon information and belief, was manufactured in and under Delaware law on the life of Sidney Dennis (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

2. The Policy was originated and procured by a family of interrelated Delaware entities known generally as Coventry, which operated a STOLI program that generated large numbers of multi-million dollar STOLI policies, including the Policy here.

3.     Mr. Dennis (the "Insured") has now passed away, and the death benefits of the Policy have been paid by the life insurer to Wells Fargo as the record owner and beneficiary of the Policy.

4.     However, according to Delaware's long-standing common law, as clearly codified by Delaware statute, and as confirmed recently by multiple courts, including the Delaware Supreme Court, the Estate is entitled to require Wells Fargo to disgorge to the Estate the Policy death benefits that were paid to it, together with substantial pre-judgment interest. *See* 18 *Del. C.* § 2704(b); *Estate of Barotz v. Vida Longevity Fund*, 2022 WL 16833545, at *12-13 (Del. Super. Ct. Nov. 9, 2022) ("*Estate of Barotz*") (granting summary judgment for estate of insured on policy lacking insurable interest and awarding death benefit and interest to the estate), *aff'd*, 320 A.3d 212 (Del. 2024); *Lavastone Capital v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Estate of Berland I*") (addressing certified questions and confirming that "if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient"); *Estate of Berland v. Lavastone Capital*, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Estate of Berland II*") (on remand, district court awarding, on summary judgment, the policy's death benefit to family of insured, plus substantial pre-judgment interest); *see also Estate of Malkin v. Wells Fargo Bank*, 998 F.3d 1186 (11th Cir. 2021) ("*Estate of Malkin II*") (affirming district court decision

2

finding on summary judgment that identically-procured Coventry policy was a void *ab initio* human life wager, and certifying remaining questions to the Delaware Supreme Court, which confirmed that estate of insured was entitled to policy proceeds, in *Wells Fargo Bank v. Estate of Malkin*, 278 A.3d 53 (Del. 2022) ("*Malkin*")).

## PARTIES

5.      Sidney Dennis was a citizen of Florida at the time of his death, and the Estate is a citizen of Florida. Mr. Dennis's son, Maurice Dennis, was appointed by a Florida probate court to serve as Personal Representative of the Estate.

6.      Defendant Wells Fargo is a national banking association organized and existing under federal law with its main office located in South Dakota. Wells Fargo is named as a party to this action because, as set forth below, it was the owner and beneficiary of the Policy and received the Policy death benefits from the insurance company that issued it.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction under Article IV, § 7 of the Delaware Constitution, 10 *Del. C.* § 541, and 10 *Del. C.* § 6501, *et seq.*, because there is an actual controversy between the parties and such controversy is ripe.

8.      Venue is proper in the Superior Court of Delaware because, as set out in further detail below, this litigation concerns the issuance of a Delaware life

3

insurance policy that, upon information and belief, was applied for via an application that was signed in Delaware, and the Policy was delivered to a Delaware trust in Delaware.

9.    There is an actual controversy between the parties, which is ripe for judicial resolution. The Policy at issue in this case was an illegal human life wager that is void *ab initio* and lacks an insurable interest under the applicable law.

10.    The parties therefore have an actual controversy over whether the Policy was void *ab initio* and whether, under applicable law, the Estate is entitled to the death benefits paid on the Policy.

11.    This Court has personal jurisdiction over Wells Fargo because, among other things, the Estate's cause of action arises out of Wells Fargo's transaction of business in Delaware and its contracts to supply services in Delaware, including Wells Fargo's role in connection with the Wells Fargo Origination Agreements (defined below). *See* 10 Del. C. § 3104(c)(1), (2).

12.    This Court has personal jurisdiction over Wells Fargo because Wells Fargo caused injury in Delaware when Wells Fargo claimed and received the death benefits of a STOLI policy—acts that constitute "a violation of Article II, Section 17 of Delaware['s] Constitution and of the State's public policy." *Malkin*, 278 A.3d at 65; *See* 10 Del. C. § 3104(c)(3).

4

13.    This Court has personal jurisdiction over Wells Fargo because Wells Fargo derives substantial revenue from the banking services, including from STOLI-related banking services, it provides in Delaware. *See* 10 Del. C. § 3104(c)(4).

14.    This Court also has specific personal jurisdiction over Wells Fargo through Delaware's "conspiracy theory" of personal jurisdiction, under which conspirators absent from the state are nevertheless subject to specific personal jurisdiction in Delaware where: (i) a conspiracy to defraud existed; (ii) the defendant was a member of that conspiracy; (iii) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (iv) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (v) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982); *Chanlder v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003).

15.    Here, the Policy was procured through Coventry's Delaware-centered STOLI scheme. As explained in further detail herein—Wells Fargo and others— were knowing and active participants in this conspiracy, having joined in, sustained, and benefited from the STOLI scheme. Further, as confirmed multiple times by the

5

Delaware Supreme Court, STOLI is, among other things, a "fraud on the court." *Malkin*, 278 A.3d at 56.

16. Wells Fargo knew that the Policy was procured and administered through a Delaware-centered STOLI scheme, and that by acquiring the Policy and/or the purported rights to the Policy's death benefit, it was joining a conspiracy, and that its actions would directly affect Delaware's interests by wagering on human life in violation of Delaware's Constitution, statutes, and public policy. The harm to Delaware and the Estate was a direct and foreseeable consequence of Wells Fargo's participation in and perpetuation of this Delaware-based STOLI conspiracy. Wells Fargo's decision to collect and receive illegal STOLI death benefits was a violation of the Delaware Constitution that was directed at and felt in Delaware. Wells Fargo's request for and collection of the STOLI death benefits was the culmination of the original conspiracy to circumvent and violate Delaware's insurable interest laws and the culmination of the original wager on Mr. Dennis's life.

17. Assignment to the Complex Commercial Litigation Division is appropriate because the amount in controversy exceeds $1,000,000.

### **BACKGROUND**

18. This action concerns a life insurance policy controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 *Del. C.* §

6

2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." § 2704(e)(4). The Delaware insurable interest statute further provides that a Delaware trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." § 2704(e)(4), (g). Notably, here, on information and belief, the Policy was issued for delivery to the Sidney Dennis Family Insurance Trust, a Delaware statutory trust, in Delaware, and on information and belief, was signed for by Wilmington Trust Company ("Wilmington Trust") as trustee, which has (and had) its principal place of business in Delaware.

19.    As the Delaware Supreme Court has recognized: "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured by entities lacking insurable interest in the life of the insured violate Delaware's insurable interest requirement and public policy. *Id.*

20.    Although speculators have existed for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than recently. In the early 2000s, institutional investors began pooling

7

large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See, e.g.,* Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization,* 13 U. Pa. J. Bus. L. 173, 192 (2010).

21.    It is well established, however, that when this was happening in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high-face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe,* 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

22.    One such STOLI promoter was a family of interrelated Delaware entities known generally as "Coventry," which operated a large, Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained further below, Coventry operated what has come to be called a "back-end" STOLI scheme using non-recourse premium financing.

23.    Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior

8

citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

24.    The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as a "risk-free" opportunity, "just a good deal," and similar to "hitting the lottery" or getting "bingo."

25.    The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities, including that the policies at issue were procured by third parties without an insurable interest in the insureds.

26.    STOLI policies violate insurable interest laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of insureds with a genuine need for protection—into cash machines for strangers to the insureds who are more interested in seeing them dead than alive.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

27.    The role of Coventry, Wells Fargo, and U.S. Bank in connection with the origination, maintenance, and/or maturation of the Policy dates back many years.

28.    Beginning in 2001, Coventry, U.S. Bank, and Lavastone Capital LLC (which was formerly known as AIG Life Settlements LLC and is referred to herein

9

as "Lavastone") entered into a series of requirements contracts through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with U.S. Bank serving in various roles, including as trustee, fiscal agent, and/or securities intermediary (the "U.S. Bank Origination Agreements").[1] Beginning in or about 2008, Coventry, Wells Fargo, and Lavastone entered into a series of requirements contracts that were effectively identical to the U.S. Bank Origination Agreements and through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with Wells Fargo serving in various roles including as trustee, fiscal agent, and/or securities intermediary (the "Wells Fargo Origination Agreements").

29.    More specifically, pursuant to the U.S. Bank Origination Agreements and the Wells Fargo Origination Agreements (collectively, the "Origination Agreements") and related contracts, Coventry, as the "Originator," was obligated to create large numbers of life insurance policies that (subject to certain exceptions that rarely applied) Lavastone was required to purchase from Coventry. Lavastone's purchase from Coventry would, in all or virtually all cases, be facilitated by U.S.

---

[1] Lavastone is an affiliate of the American International Group (often referred to as "AIG").

Bank or Wells Fargo, which served in many different roles, including as trustee of various trusts and/or as fiscal agent, and as securities intermediary for Coventry, Lavastone, and other investors.

30. To manufacture such life insurance policies intended for transfer on the secondary life insurance market, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would procure on each insured's life.

31. Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carriers, thus further adding to Coventry's financial incentive to originate new life insurance policies.

32. Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the maintenance of the policies or even the "liquidation" of the policies.

11

33.    Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. In many cases, if not all, these life expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was a Coventry "Approved Underwriter" as defined by the Origination Agreements between Coventry, Lavastone, and U.S. Bank or Wells Fargo.

34.    Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how profitable to Coventry and its cohorts a particular policy (if procured) might be.

35.    Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of the local insurance brokers, would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

36.    Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would then create and fund (sometimes with no more than a single dollar) a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential

policy on an insured's life. Coventry would create and fund each Delaware trust by directing the local insurance broker to have the insured execute a number of boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with $1.00. The Delaware trusts would have no other assets, and would be established by and for Coventry, and typically were expressly not intended to serve any valid estate planning need for the insureds.

37.    Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy procured by Coventry through the Delaware trusts, on the insured's life.

38.    With regard to all of the Delaware trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

13

39.    Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

40.    The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts (i.e., the Origination Agreements) under which it was engaged (indeed required) to "originate" life insurance policies for resale to other investors.

41.    The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the

14

terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

42. Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

43. But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware Trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to Lavastone pursuant to the Origination Agreements (which, on information and belief, is what occurred in the majority of Coventry's transactions) and Lavastone would either hold the policy until maturity or resell it to another investor. Alternatively, the policy in question could be sold to Coventry for

15

an amount in excess of the loan balance (and then sold by Coventry to Lavastone pursuant to the Origination Agreements) or sold to a third-party for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, the thousands of policies originated by the Coventry through the Origination Agreements ended up, in almost all instances, on the secondary life insurance market, just as intended, and usually with Coventry (and then Lavastone and then others) as the investors, with U.S. Bank or Wells Fargo as the record owners and beneficiaries, and with the investors either keeping the policies until maturity or reselling them to yet other investors.

44.    Coventry and others were often also engaged by Lavastone or other investors to "service" each policy until the insured died, which required that Coventry or these others pay ongoing policy premiums on behalf of the policy's actual owner, and Coventry or these others would contact the insured or their family on a regular basis to confirm whether the insured had died yet. Once Coventry or these others learned an insured had died, they would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

45.    Every court that has considered Coventry's scheme under Delaware law has held, as a matter of law, that: (i) the Coventry program was a STOLI program; and (ii) policies produced by the program are void *ab initio*. *See, e.g., Estate of Barotz*, 320 A.3d 212 (affirming grant of summary judgment for estate of

16

insured on Coventry STOLI policy lacking insurable interest and awarding death benefit and interest to the estate), *aff'g* 2022 WL 16833545; *Estate of Daher v. LSH*, 2024 WL 3571642, at *3 (C.D. Cal. July 23, 2024) (declaring Coventry policy void *ab initio* on summary judgment under Delaware law); *U.S. Bank v. Estate of Albart*, 2023 WL 7491131 (Fla. 5th Cir. Ct. Oct. 23, 2023) ("*Estate of Albart*") (same); *Estate of Diamond v. U.S. Bank*, 2023 WL 6392688 (Fla. 15th Cir. Ct. Sept. 15, 2023) ("*Estate of Diamond*") (same); *Estate of Berland II*, 2022 WL 15023450 (same); *Estate of Malkin v. Wells Fargo Bank*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019) ("*Estate of Malkin I*") (same); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601 (D. Del. 2019) (same); *U.S. Bank v. Sun Life*, 2016 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted* 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (same); *Sun Life v. U.S. Bank*, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd* 693 F. App'x 838 (11th Cir. 2017) (same).

46.     On November 16, 2021, in *Estate of Berland I*, the Delaware Supreme Court issued a unanimous *en banc* decision, which involved certified questions of law arising out of a Coventry-procured life insurance policy. 266 A.3d at 970-74. In that decision, the Delaware Supreme Court held that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force." *Id.* at 968 (quoting *Price Dawe*, 28 A.3d at 1065).

17

47.    In so holding, the Delaware Supreme Court reaffirmed its prior unanimous, *en banc* decision in *Price Dawe*, which held, *inter alia*, that Delaware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can "never" be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 28 A.3d at 1068 n.25, 1071.

48.    In *Estate of Berland I*, the Delaware Supreme Court also confirmed that, when a life insurance company pays on a STOLI policy that lacks an insurable interest, then the estate of the insured is entitled to sue the payee to require disgorgement of the policy proceeds, plus substantial prejudgment interest. 266 A.3d at 970-74; *see also Estate of Berland II*, 2022 WL 15023450.

49.    On May 26, 2022, after the Eleventh Circuit certified questions in *Estate of Malkin*, the Delaware Supreme Court, in yet another unanimous *en banc* decision, confirmed that, if a life insurance policy governed by Delaware law (like the Coventry policy at issue in *Estate of Malkin*) is deemed to be a void *ab initio* human life wager, whatever policy proceeds were paid must be disgorged to the estate of the insured as a matter of Delaware's "longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit," pursuant to Section 2704(b) of Delaware's

18

insurable interest statute, which codified that common law cause of action and provides:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

*Malkin*, 278 A.3d at 60-61 (*quoting* Section 2704(b)).

50.     The Delaware Supreme Court further held, *inter alia,* that various UCC defenses do not apply in the context of insurable interest claims, and further explained that a defendant in such a case is allowed to obtain a credit for premiums only under limited circumstances. *Id.* at 56, 60, 63-67; *see also Estate of Barotz*, 320 A.3d 212 (Delaware Supreme Court affirming award of death benefit, plus interest, to estate where policy procured through Coventry program).

## The Application and Issuance of the Policy

51.     In or around 2005, Transamerica Life Insurance Company ("Transamerica") received an application for life insurance (the "Application") seeking a life insurance policy on the life of Mr. Dennis, who was then 78 years old.

52.     The Application identified the owner and beneficiary of the proposed policy as the Trust, a Delaware statutory trust formed under Delaware law, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890.

19

53.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Application was executed by an officer for the Trust's trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office, as owner and beneficiary of the Policy.

54.     In reliance upon the representations contained in the Application, and other documents and information submitted to Transamerica in connection with the Application, Transamerica issued the Policy bearing policy number 60130474.

55.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Transamerica received a delivery receipt for the Policy executed by an officer for the Trust's trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office.

### The Policy Lacked Insurable Interest and Was Procured Illegally on Mr. Dennis's Life

56.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy lacked an insurable interest at its inception, and was procured on the life of Mr. Dennis as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional, statutory, and common law prohibitions. Any appearance of insurable interest was superficial only.

57.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry (or third parties lacking an insurable interest in the Insured's life) paid the Policy's premiums; and, as will likely have

20

evidentiary support after a reasonable opportunity for further investigation or discovery, neither the Insured nor anyone else with an insurable interest in his life paid the premiums or were at risk that their funds would be used to pay the premiums.

58.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, to induce the Insured to allow the Policy to be procured on his life, Coventry and those acting on its behalf may have represented that the Policy was being procured through legitimate and legal transactions, or further induced the Insured with the promise of financial compensation if he permitted the Policy to be procured.

59.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry acted through its agent(s) to have the Application for the Policy submitted to Transamerica.

60.    To facilitate these transactions, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry created the Trust as a Delaware trust, installed Wilmington Trust as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

61.    The Trust was a sham and used as a cover because, as will likely have evidentiary support after a reasonable opportunity for further investigation or

21

discovery, it was nominally funded and created as a means to conceal from the insurance carrier the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trust lacked any valid insurable interest in the Insured's life.

62. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry further created a sub-trust to the Trust. The sub-trust was also established as a mere cover to procure the Policy without a valid insurable interest.

63. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy was issued for delivery in Delaware to the Trust and was delivered in Delaware to the Trust, as described above.

64. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

65. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purported "loan" was secured solely by a security interest in the Trust and sub-trust that held the Policy.

22

66.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, as a result of the purported "loan," neither the Insured nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the loan was used to conceal from the insurance carrier the fact that such premiums were paid by Coventry for the purpose of creating wagers on the Insured's life.

67.     Moreover, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purpose of the Policy was not to provide estate protection for the Insured, but rather, the Insured was used as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on the Insured's early demise.

68.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, approximately two years after the Policy was issued, stranger investors unrelated to Mr. Dennis took formal control of the Policy.

69.     From the start of its involvement with the Wells Fargo Origination Agreements, Wells Fargo has known that it was participating in a STOLI operation in violation of Delaware law.

70.     From the start of its involvement with the Policy at issue here, Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable

23

interest. Yet, Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

71. As noted, since 2011, when the Delaware Supreme Court issued its *Price Dawe* decision, which outlawed STOLI under Delaware law, Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable interest. Yet, Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

72. And since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. However, since at least 2016—before the Insured passed away and Wells Fargo sought the Policy's death benefits here—Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable interest. Yet Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

73. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in a conspiracy to effectuate an illegal STOLI transaction in violation of Delaware law, Wells Fargo, its principals or agents, and/or others working in concert with it, repeatedly invaded the Insured's privacy and that of his family by contacting the Insured and his family frequently to determine whether he was still alive and, if so, to check on the status of his health.

24

74.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in a conspiracy to effectuate an illegal STOLI transaction in violation of Delaware law, Wells Fargo, its principals or agents, and/or others working in concert with it further invaded the Insured's privacy by procuring the Insured's confidential medical records on a regular basis, and then providing those records to third parties to obtain up-to-date life-expectancy reports so as to assess the current value of its wager, as well as to allow potential purchasers to assess the value of the Policy based on when these strangers believed the Insured would die.

75.     Multiple state insurance departments have condemned STOLI schemes as offending senior citizens' human dignity and as subjecting the straw insureds to various other harms, including the violation of their privacy through intrusive contact like that described above, and by misusing their private medical information to maximize their bets on the insureds' lives.

76.     On March 17, 2024, Mr. Dennis passed away.

77.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Transamerica subsequently received claims for the Policy's death benefits by or on behalf of Wells Fargo, and thereafter paid the Policy's death benefits to Wells Fargo accordingly.

## COUNT I

25

## RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

78.     The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

79.     As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Application identified the owner and beneficiary of the proposed policy as the Trust, a Delaware statutory trust formed under Delaware law and with a Delaware-based trustee. The Policy was then issued to and actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. For these and other reasons, the Policy is governed by Delaware law. 18 *Del. C.* § 2704(e)(4), (g).

80.     For the reasons set forth above, the Policy lacks an insurable interest. *Price Dawe*, 28 A.3d 1059; *Estate of Berland I*, 266 A.3d 964.

81.     Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or other payee that received the benefits as a matter of common law and statute. 18 *Del. C.* § 2704 (b). *See, e.g., Estate of Berland I*, 266 A.3d 964; *Estate of Malkin I*, 379 F. Supp. 3d 1263.

82.     The Policy death benefits were paid, transferred, or otherwise assigned to Wells Fargo, its principals or agents, or others working in concert with them.

26

83. As a consequence, the Estate is entitled to recover the death benefits (plus applicable interest, attorneys' fees, and other costs and damages) from or through Wells Fargo.

## PRAYER FOR RELIEF

WHEREFORE, the Estate respectfully requests that this Court enter judgment against Wells Fargo in an amount equal to the amount of the death benefits received plus pre-judgment interest, 'costs, attorneys' fees, and any such other relief as the Court deems just and proper.

**COZEN O'CONNOR**

Dated: January 12, 2026

*/s/ Nathan D. Barillo*
Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

*Attorneys for Plaintiff,*
*The Estate of Sidney Dennis*

27

Cozen O Connor
Attn: Nathan Barillo/Kaan Ekiner
1201 N. Market Street, Suite 1001
Wilmington, DE 19801

9589 0710 5270 2684 3641 23



quadient
FIRST-CLASS MAIL
IMI
$012.14 º
01/13/2026 ZIP 19801
043M31239397

US POSTAGE

Wells Fargo Bank, N.A.
101 North Phillips Avenue
Sioux Falls, SD 57104



ORIGIN ID:GPZA        (999) 999-9999
CHARLEY PAULSEN
WELLS FARGO-UTILITY SERVICES
1801 PARK VIEW DR
N9160-010 FL 01
SHOREVIEW, MN 55126
UNITED STATES US

SHIP DATE: 20JAN26
ACTWGT: 0.50 LB
CAD: 104583435/WSXI2600

BILL RECIPIENT

TO  SOP / WELLS FARGO
CORPORATION SERVICE COMPANY
1201 HAYS STREET
ATTN: SOP/WELLS FARGO
TALLAHASSEE FL 32301
(800) 927-9801                REF: 0049088
INV:
PO: N9160-010                DEPT: ESO

FedEx
Express

E

WED - 21 JAN 5:00P
STANDARD OVERNIGHT

TRK#
0201    3979 3780 7363

XA TLHA          FL-US    32301
TLH

eSO Shipment -- Label

856-2503
ETP-14

1/20/26, 10:47 AM

e Large

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Estate of Sidney Dennis, by its personal representative, Maurice Dennis, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | ***Jury trial demanded*** |
| | : | |
| v. | : | Removed from the Superior Court |
| | : | of the State of Delaware, in and for |
| Wells Fargo Bank, N.A., | : | New Castle County, Civil Action |
| | : | N26C-01-263 |
| Defendant. | : | |

***Exhibit 9 to Notice of Removal***


K&L Gates LLP
Robert K. Beste (3931)
600 North King Street, Suite 1501
Wilmington, Delaware 19801
(302) 416-7000
robert.beste@klgates.com

February 4, 2026                    *Attorneys for Wells Fargo Bank, N.A.*



EFiled: Jan 15 2026 10:54AM EST
Transaction ID 78215245
Case No. N26C-01-263 SKR CCLD

EFiled: Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR CCLD

## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

|  |  |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis, | C.A. No. |
| Plaintiff, | Service Pursuant to 10 *Del. C.* § 3104 |
| v. | |
| WELLS FARGO BANK, N.A., | |
| Defendant. | |

### SUMMONS

**TO PLAINTIFF'S COUNSEL**

**YOU ARE COMMANDED:**

To summon the above-named Defendant, Wells Fargo Bank, N.A., so that, within 20 days of notice, Defendant shall serve upon Kaan Ekiner, Esquire, Plaintiff's attorney, whose address is Cozen O'Connor, 1201 N. Market Street, Suite 1001, Wilmington, DE 19801, an Answer to the Complaint (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense).

To serve upon the Defendant a copy hereof and of the complaint.

Dated: 1-15-26

**COLLEEN REDMOND**
Prothonotary

*Cynthia Coleman*
Per Deputy

**TO THE ABOVE NAMED DEFENDANT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on Plaintiff's attorney named above an Answer to the Complaint, (and, if the Complaint contains specific notation requiring the Defendant to answer any or all allegations of the complaint by affidavit, an affidavit of defense), judgment by default will be rendered against you for the relief demanded in the Complaint.



**COLLEEN REDMOND**
Prothonotary

Per Deputy

2

EFiled: Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR



## IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE

| | |
|---|---|
| ESTATE OF SIDNEY DENNIS, by Its Personal Representative, Maurice Dennis,<br><br>    Plaintiff,<br><br>  v.<br><br>WELLS FARGO BANK, N.A.,<br><br>    Defendant. | C.A. No.<br><br><br>**Service Pursuant to 10 *Del. C.* § 3104** |

## PRAECIPE

TO: Office of the Prothonotary
   Superior Court of Delaware
   New Castle County Courthouse
   500 North King Street
   Wilmington, DE 19801

Please issue a Summons in the form attached hereto for service of process on

Defendant, Wells Fargo Bank, N.A., pursuant to 10 *Del. C.* § 3104. Plaintiff's

counsel will serve the Summons and Complaint upon Defendant, Wells Fargo Bank

N.A., by certified mail, return receipt requested, by serving it at the following

address:

  Wells Fargo Bank, N.A.
  101 North Phillips Avenue
  Sioux Falls, SD 57104

**COZEN O'CONNOR**

Dated: January 12, 2026

*/s/ Nathan D. Barillo*
Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

*Attorneys for Plaintiff,*
*The Estate of Sidney Dennis*

2

**SUPERIOR COURT** EFiled: Jan 12 2026 04:06PM EST
CIVIL CASE INFORMATION STATEMENT (CIS) Transaction ID 78184987
Case No. N26C-01-263 SKR

COUNTY:   __N__   K   S       CIVIL ACTION NUMBER: _____

| | |
|---|---|
| CAPTION:<br><br>ESTATE OF SIDNEY DENNIS, BY ITS PERSONAL REPRESENTATIVE, MAURICE DENNIS,<br><br>                    PLAINTIFF,<br>        V.<br><br>WELLS FARGO BANK, N.A.<br><br>                    DEFENDANT. | CIVIL CASE CODE: _____CCLD_____<br><br>CIVIL CASE TYPE: COMPLEX COMMERCIAL LITIGATION DIVISION<br>                    (SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) NO<br><br>NAME AND STATUS OF PARTY FILING DOCUMENT: PLAINTIFF, THE ESTATE OF SIDNEY DENNIS<br><br>DOCUMENT TYPE: (E.G., COMPLAINT; ANSWER WITH COUNTERCLAIM):<br>COMPLAINT<br><br>      JURY DEMAND: YES      NO __X__ |
| Attorney Name(s):<br><br>Kaan Ekiner, Nathan Barillo<br><br>Attorney I.D.(s):<br><br>5607, 5863<br><br>Firm Name:<br><br>Cozen O'Connor<br><br>Address:<br><br>1201 Market Street, Suite 1001<br><br>Wilmington, DE 19801<br><br>Telephone Number:<br>(302) 295-2046<br><br>Fax Number:<br>(302) 250-4356<br><br>Email Address:<br>kekiner@cozen.com, nabrillo@cozen.com | Identify any related cases now pending in the Superior Court or any related cases that have been closed in this court within the last two years by caption and civil action number including judge's initials:<br><br>_____<br><br>_____<br><br>Explain the relationship(s):<br><br>_____<br><br>_____<br><br>_____<br><br>Other unusual issues that affect case management:<br><br>_____<br><br>_____<br><br>_____<br><br>(If additional space is needed, please attach page) |

**The Prothonotary will not process the complaint, answer or first responsive pleading in this matter for service until the case information statement (CIS) is filed. The failure to file the CIS and have the pleading processed for service may result in the dismissal of the complaint or may result in the answer or first responsive pleading being stricken.**

EFiled: Jan 12 2026 04:06PM EST
Transaction ID 78184987
Case No. N26C-01-263 SKR

## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ESTATE OF SIDNEY DENNIS, by Its
Personal Representative, Maurice
Dennis,

                Plaintiff,

      v.

WELLS FARGO BANK, N.A.,

              Defendant.

C.A. No. N26C-
(CCLD)

## COMPLAINT

Plaintiff, the Estate of Sidney Dennis, by its Personal Representative, Maurice Dennis (the "Estate" or "Plaintiff"), brings this Complaint against Defendant, Wells Fargo Bank, N.A. ("Wells Fargo"), and in support thereof, alleges as follows.

## INTRODUCTION

1.  This action involves a stranger-originated life insurance ("STOLI") policy, which, upon information and belief, was manufactured in and under Delaware law on the life of Sidney Dennis (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

2.  The Policy was originated and procured by a family of interrelated Delaware entities known generally as Coventry, which operated a STOLI program that generated large numbers of multi-million dollar STOLI policies, including the Policy here.

3.      Mr. Dennis (the "Insured") has now passed away, and the death benefits of the Policy have been paid by the life insurer to Wells Fargo as the record owner and beneficiary of the Policy.

4.      However, according to Delaware's long-standing common law, as clearly codified by Delaware statute, and as confirmed recently by multiple courts, including the Delaware Supreme Court, the Estate is entitled to require Wells Fargo to disgorge to the Estate the Policy death benefits that were paid to it, together with substantial pre-judgment interest. *See* 18 *Del. C.* § 2704(b); *Estate of Barotz v. Vida Longevity Fund*, 2022 WL 16833545, at *12-13 (Del. Super. Ct. Nov. 9, 2022) ("*Estate of Barotz*") (granting summary judgment for estate of insured on policy lacking insurable interest and awarding death benefit and interest to the estate), *aff'd*, 320 A.3d 212 (Del. 2024); *Lavastone Capital v. Estate of Berland*, 266 A.3d 964, 970-74 (Del. 2021) ("*Estate of Berland I*") (addressing certified questions and confirming that "if a death benefit is paid under an insurance policy that lacks an insurable interest, the estate of the insured may recover the death benefit from the recipient"); *Estate of Berland v. Lavastone Capital*, 2022 WL 15023450 (D. Del. Sept. 28, 2022) ("*Estate of Berland II*") (on remand, district court awarding, on summary judgment, the policy's death benefit to family of insured, plus substantial pre-judgment interest); *see also Estate of Malkin v. Wells Fargo Bank*, 998 F.3d 1186 (11th Cir. 2021) ("*Estate of Malkin II*") (affirming district court decision

2

finding on summary judgment that identically-procured Coventry policy was a void *ab initio* human life wager, and certifying remaining questions to the Delaware Supreme Court, which confirmed that estate of insured was entitled to policy proceeds, in *Wells Fargo Bank v. Estate of Malkin*, 278 A.3d 53 (Del. 2022) ("*Malkin*")).

## PARTIES

5.     Sidney Dennis was a citizen of Florida at the time of his death, and the Estate is a citizen of Florida. Mr. Dennis's son, Maurice Dennis, was appointed by a Florida probate court to serve as Personal Representative of the Estate.

6.     Defendant Wells Fargo is a national banking association organized and existing under federal law with its main office located in South Dakota. Wells Fargo is named as a party to this action because, as set forth below, it was the owner and beneficiary of the Policy and received the Policy death benefits from the insurance company that issued it.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction under Article IV, § 7 of the Delaware Constitution, 10 *Del. C.* § 541, and 10 *Del. C.* § 6501, *et seq.*, because there is an actual controversy between the parties and such controversy is ripe.

8.     Venue is proper in the Superior Court of Delaware because, as set out in further detail below, this litigation concerns the issuance of a Delaware life

insurance policy that, upon information and belief, was applied for via an application that was signed in Delaware, and the Policy was delivered to a Delaware trust in Delaware.

9.    There is an actual controversy between the parties, which is ripe for judicial resolution. The Policy at issue in this case was an illegal human life wager that is void *ab initio* and lacks an insurable interest under the applicable law.

10.    The parties therefore have an actual controversy over whether the Policy was void *ab initio* and whether, under applicable law, the Estate is entitled to the death benefits paid on the Policy.

11.    This Court has personal jurisdiction over Wells Fargo because, among other things, the Estate's cause of action arises out of Wells Fargo's transaction of business in Delaware and its contracts to supply services in Delaware, including Wells Fargo's role in connection with the Wells Fargo Origination Agreements (defined below). *See* 10 Del. C. § 3104(c)(1), (2).

12.    This Court has personal jurisdiction over Wells Fargo because Wells Fargo caused injury in Delaware when Wells Fargo claimed and received the death benefits of a STOLI policy—acts that constitute "a violation of Article II, Section 17 of Delaware['s] Constitution and of the State's public policy." *Malkin*, 278 A.3d at 65; *See* 10 Del. C. § 3104(c)(3).

4

13.     This Court has personal jurisdiction over Wells Fargo because Wells Fargo derives substantial revenue from the banking services, including from STOLI-related banking services, it provides in Delaware. *See* 10 Del. C. § 3104(c)(4).

14.     This Court also has specific personal jurisdiction over Wells Fargo through Delaware's "conspiracy theory" of personal jurisdiction, under which conspirators absent from the state are nevertheless subject to specific personal jurisdiction in Delaware where: (i) a conspiracy to defraud existed; (ii) the defendant was a member of that conspiracy; (iii) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (iv) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (v) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982); *Chanlder v. Ciccoricco*, 2003 WL 21040185, at *8 (Del. Ch. May 5, 2003).

15.     Here, the Policy was procured through Coventry's Delaware-centered STOLI scheme. As explained in further detail herein—Wells Fargo and others— were knowing and active participants in this conspiracy, having joined in, sustained, and benefited from the STOLI scheme. Further, as confirmed multiple times by the

5

Delaware Supreme Court, STOLI is, among other things, a "fraud on the court."
*Malkin*, 278 A.3d at 56.

16.    Wells Fargo knew that the Policy was procured and administered through a Delaware-centered STOLI scheme, and that by acquiring the Policy and/or the purported rights to the Policy's death benefit, it was joining a conspiracy, and that its actions would directly affect Delaware's interests by wagering on human life in violation of Delaware's Constitution, statutes, and public policy. The harm to Delaware and the Estate was a direct and foreseeable consequence of Wells Fargo's participation in and perpetuation of this Delaware-based STOLI conspiracy. Wells Fargo's decision to collect and receive illegal STOLI death benefits was a violation of the Delaware Constitution that was directed at and felt in Delaware. Wells Fargo's request for and collection of the STOLI death benefits was the culmination of the original conspiracy to circumvent and violate Delaware's insurable interest laws and the culmination of the original wager on Mr. Dennis's life.

17.    Assignment to the Complex Commercial Litigation Division is appropriate because the amount in controversy exceeds $1,000,000.

## BACKGROUND

18.    This action concerns a life insurance policy controlled by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 *Del. C.* §

6

2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." § 2704(e)(4). The Delaware insurable interest statute further provides that a Delaware trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." § 2704(e)(4), (g). Notably, here, on information and belief, the Policy was issued for delivery to the Sidney Dennis Family Insurance Trust, a Delaware statutory trust, in Delaware, and on information and belief, was signed for by Wilmington Trust Company ("Wilmington Trust") as trustee, which has (and had) its principal place of business in Delaware.

19.     As the Delaware Supreme Court has recognized: "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies that are procured by entities lacking insurable interest in the life of the insured violate Delaware's insurable interest requirement and public policy. *Id.*

20.     Although speculators have existed for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than recently. In the early 2000s, institutional investors began pooling

7

large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See, e.g.*, Susan Lorde Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

21.    It is well established, however, that when this was happening in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high-face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

22.    One such STOLI promoter was a family of interrelated Delaware entities known generally as "Coventry," which operated a large, Delaware-centered STOLI program that generated thousands of STOLI policies on the lives of senior citizens from all over the United States. As explained further below, Coventry operated what has come to be called a "back-end" STOLI scheme using non-recourse premium financing.

23.    Entities such as Coventry—known in the STOLI industry as "funders"—worked with a nationwide network of insurance producers, who, acting as the funders' agents, assisted the funders by, among other things, identifying senior

8

citizens meeting the funders' investment criteria and influencing those seniors to become involved in the STOLI transactions the funders were orchestrating.

24.     The STOLI transactions orchestrated by these funders, including Coventry and its agents, were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as a "risk-free" opportunity, "just a good deal," and similar to "hitting the lottery" or getting "bingo."

25.     The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities, including that the policies at issue were procured by third parties without an insurable interest in the insureds.

26.     STOLI policies violate insurable interest laws, take advantage of senior citizens, and operate to convert legitimate life insurance products—which are designed to provide actual protection to families and others with an interest in the continued life of insureds with a genuine need for protection—into cash machines for strangers to the insureds who are more interested in seeing them dead than alive.

**Coventry's Two-Year, Non-Recourse Premium Finance STOLI Scheme**

27.     The role of Coventry, Wells Fargo, and U.S. Bank in connection with the origination, maintenance, and/or maturation of the Policy dates back many years.

28.     Beginning in 2001, Coventry, U.S. Bank, and Lavastone Capital LLC (which was formerly known as AIG Life Settlements LLC and is referred to herein

9

as "Lavastone") entered into a series of requirements contracts through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with U.S. Bank serving in various roles, including as trustee, fiscal agent, and/or securities intermediary (the "U.S. Bank Origination Agreements").[1] Beginning in or about 2008, Coventry, Wells Fargo, and Lavastone entered into a series of requirements contracts that were effectively identical to the U.S. Bank Origination Agreements and through which Coventry agreed to "originate" a large number of Delaware life insurance policies that, from the start, were intended to be transferred to Lavastone and other investors, with Wells Fargo serving in various roles including as trustee, fiscal agent, and/or securities intermediary (the "Wells Fargo Origination Agreements").

29.    More specifically, pursuant to the U.S. Bank Origination Agreements and the Wells Fargo Origination Agreements (collectively, the "Origination Agreements") and related contracts, Coventry, as the "Originator," was obligated to create large numbers of life insurance policies that (subject to certain exceptions that rarely applied) Lavastone was required to purchase from Coventry. Lavastone's purchase from Coventry would, in all or virtually all cases, be facilitated by U.S.

---

[1] Lavastone is an affiliate of the American International Group (often referred to as "AIG").

Bank or Wells Fargo, which served in many different roles, including as trustee of various trusts and/or as fiscal agent, and as securities intermediary for Coventry, Lavastone, and other investors.

30. To manufacture such life insurance policies intended for transfer on the secondary life insurance market, Coventry's origination program followed a set pattern. Through a network of local insurance brokers around the country, Coventry located senior citizens to serve as the insureds on new life insurance policies that Coventry would procure on each insured's life.

31. Coventry also routinely entered into non-exclusive agreements and other arrangements with local insurance brokers under which such brokers agreed to split with Coventry any commissions they received from the issuing insurance carriers, thus further adding to Coventry's financial incentive to originate new life insurance policies.

32. Before any policy was applied for, Coventry would obtain a broad Special Irrevocable Durable Power of Attorney over the potential insured, giving Coventry the power to originate and/or service any life insurance policies on the insured's life, which powers included, but were not limited to, the power to complete and execute any applications or other documents in connection with the maintenance of the policies or even the "liquidation" of the policies.

11

33.    Before any policy was applied for, Coventry would obtain a life expectancy report on each potential insured. In many cases, if not all, these life expectancy reports were obtained from American Viatical Services, LLC ("AVS"), which was a Coventry "Approved Underwriter" as defined by the Origination Agreements between Coventry, Lavastone, and U.S. Bank or Wells Fargo.

34.    Coventry would then use the information provided by AVS to perform its own underwriting of each prospective insured before a policy on that person's life was applied for. The purpose of this underwriting was to, among other things, project how long any potential insured might live, and thus how profitable to Coventry and its cohorts a particular policy (if procured) might be.

35.    Once Coventry determined that a particular insured was a suitable candidate for a policy, Coventry would then dictate the terms under which a policy would be applied for. Coventry, with the assistance of the local insurance brokers, would start the application process by having these local insurance brokers partially complete applications for policies to be issued by insurance carriers chosen by Coventry.

36.    Once an insurance carrier made a preliminary underwriting decision about a particular prospective insured, Coventry would then create and fund (sometimes with no more than a single dollar) a Delaware statutory trust in the insured's name to apply for and become the owner and beneficiary of any potential

12

policy on an insured's life. Coventry would create and fund each Delaware trust by directing the local insurance broker to have the insured execute a number of boilerplate and non-negotiable Coventry trust documents and to nominally fund each Delaware trust, typically with $1.00. The Delaware trusts would have no other assets, and would be established by and for Coventry, and typically were expressly not intended to serve any valid estate planning need for the insureds.

37.    Coventry would also have the insureds execute separate trust agreements whereby Coventry would create a second Delaware trust for each policy, called a sub-trust. Under the terms of the sub-trust agreements, all assets of the initial trusts were immediately transferred and assigned to the sub-trusts, including any and all future rights or interests in any life insurance policy procured by Coventry through the Delaware trusts, on the insured's life.

38.    With regard to all of the Delaware trusts, Coventry would choose the trustee, which in most, if not all, cases was Wilmington Trust, a corporate trustee located in Delaware. Coventry's form trust agreement granted broad powers to Coventry's chosen trustee, including the ability to cause the sub-trust to enter into a so-called "loan" whereby Coventry would pay all premiums for any policy on the prospective insured's life. The trustee was also given the power to assign the sub-trust's assets, including any future interest in any life insurance policy, to Coventry.

13

39.    Once this was all in place, Coventry, acting through its local insurance broker, would cause the broker to submit a formal application to the insurance carrier that had been selected by Coventry. The formal application would identify the Delaware trust in the insured's name as both the owner and beneficiary of the policy being applied for; explain that the trust had been formed in Delaware; and further explain that the initial application was signed by the insured and the trustee in Delaware. The formal application would also identify the name of the Delaware corporate trustee, with an address in Delaware.

40.    The formal application would not, however, identify the existence of the sub-trust; Coventry's involvement in the transaction; the fact that Coventry was actually paying the policy's premiums; the fact that Coventry was receiving consideration, including half of the commissions; or the fact that Coventry had previously entered into a series of contracts (i.e., the Origination Agreements) under which it was engaged (indeed required) to "originate" life insurance policies for resale to other investors.

41.    The policy itself would then be issued by the Coventry-selected insurance carrier for delivery to the Delaware corporate trustee of the Delaware trust owner. The Delaware corporate trustee would then execute a policy delivery receipt in Delaware, acknowledging actual physical delivery and legal acceptance of the

14

terms of the policy in Delaware, thus creating a Delaware trust-owned insurance policy controlled by Delaware law.

42.    Through its so-called "loan" with the sub-trust, Coventry would then pay the policy's premium by wire transfer, which allowed Coventry to continue to conceal its involvement in the origination and procurement of the policy. Under the terms of Coventry's "loan," Coventry obtained an immediate assignment of and control over, among other things, any policy issued to the trust and conveyed to the sub-trust.

43.    But the so-called "loan" to the sub-trust was a sham. It was structured with a 26- or 30-month term with no genuine obligation for anyone to repay and no recourse to the insured. The "loan" otherwise carried excessive interest, fees, and expenses, and was in effect designed to discourage its repayment. Indeed, the "loan" did not need to be repaid at all. Instead, the "loan" was designed so that at the end of the term, all rights and interests in both the Delaware Trust that owned the policy and the sub-trust—specifically including all rights and interests in the policy—could simply be irrevocably relinquished to Coventry in full satisfaction of the "loan" and then sold by Coventry to Lavastone pursuant to the Origination Agreements (which, on information and belief, is what occurred in the majority of Coventry's transactions) and Lavastone would either hold the policy until maturity or resell it to another investor. Alternatively, the policy in question could be sold to Coventry for

an amount in excess of the loan balance (and then sold by Coventry to Lavastone pursuant to the Origination Agreements) or sold to a third-party for an amount in excess of the loan balance, with the sale proceeds being used to repay the loan. Either way, the thousands of policies originated by the Coventry through the Origination Agreements ended up, in almost all instances, on the secondary life insurance market, just as intended, and usually with Coventry (and then Lavastone and then others) as the investors, with U.S. Bank or Wells Fargo as the record owners and beneficiaries, and with the investors either keeping the policies until maturity or reselling them to yet other investors.

44.    Coventry and others were often also engaged by Lavastone or other investors to "service" each policy until the insured died, which required that Coventry or these others pay ongoing policy premiums on behalf of the policy's actual owner, and Coventry or these others would contact the insured or their family on a regular basis to confirm whether the insured had died yet. Once Coventry or these others learned an insured had died, they would obtain a death certificate and prepare the necessary forms to make a claim for the policy's death benefit.

45.    Every court that has considered Coventry's scheme under Delaware law has held, as a matter of law, that: (i) the Coventry program was a STOLI program; and (ii) policies produced by the program are void *ab initio*. *See, e.g., Estate of Barotz*, 320 A.3d 212 (affirming grant of summary judgment for estate of

16

insured on Coventry STOLI policy lacking insurable interest and awarding death benefit and interest to the estate), *aff'g* 2022 WL 16833545; *Estate of Daher v. LSH*, 2024 WL 3571642, at *3 (C.D. Cal. July 23, 2024) (declaring Coventry policy void *ab initio* on summary judgment under Delaware law); *U.S. Bank v. Estate of Albart*, 2023 WL 7491131 (Fla. 5th Cir. Ct. Oct. 23, 2023) ("*Estate of Albart*") (same); *Estate of Diamond v. U.S. Bank*, 2023 WL 6392688 (Fla. 15th Cir. Ct. Sept. 15, 2023) ("*Estate of Diamond*") (same); *Estate of Berland II*, 2022 WL 15023450 (same); *Estate of Malkin v. Wells Fargo Bank*, 379 F. Supp. 3d 1263 (S.D. Fla. 2019) ("*Estate of Malkin I*") (same); *Sun Life v. U.S. Bank*, 369 F. Supp. 3d 601 (D. Del. 2019) (same); *U.S. Bank v. Sun Life*, 2016 8116141 (E.D.N.Y. Aug. 30, 2016), *adopted* 2017 WL 347449 (E.D.N.Y. Jan. 24, 2017) (same); *Sun Life v. U.S. Bank*, 2016 WL 161598 (S.D. Fla. Jan. 14, 2016), *aff'd* 693 F. App'x 838 (11th Cir. 2017) (same).

46.    On November 16, 2021, in *Estate of Berland I*, the Delaware Supreme Court issued a unanimous *en banc* decision, which involved certified questions of law arising out of a Coventry-procured life insurance policy. 266 A.3d at 970-74. In that decision, the Delaware Supreme Court held that "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force." *Id.* at 968 (quoting *Price Dawe*, 28 A.3d at 1065).

17

47.     In so holding, the Delaware Supreme Court reaffirmed its prior unanimous, *en banc* decision in *Price Dawe*, which held, *inter alia*, that Delaware has an immense public policy interest in preventing STOLI transactions from coming to fruition. Indeed, as *Price Dawe* held, STOLI policies violate Delaware's Constitution and are, therefore, void *ab initio* and a "fraud on the court" and can "never" be enforced, and thus assignments of STOLI policies are also void *ab initio* and ineffective as a matter of law. 28 A.3d at 1068 n.25, 1071.

48.     In *Estate of Berland I*, the Delaware Supreme Court also confirmed that, when a life insurance company pays on a STOLI policy that lacks an insurable interest, then the estate of the insured is entitled to sue the payee to require disgorgement of the policy proceeds, plus substantial prejudgment interest. 266 A.3d at 970-74; *see also Estate of Berland II*, 2022 WL 15023450.

49.     On May 26, 2022, after the Eleventh Circuit certified questions in *Estate of Malkin*, the Delaware Supreme Court, in yet another unanimous *en banc* decision, confirmed that, if a life insurance policy governed by Delaware law (like the Coventry policy at issue in *Estate of Malkin*) is deemed to be a void *ab initio* human life wager, whatever policy proceeds were paid must be disgorged to the estate of the insured as a matter of Delaware's "longstanding common-law rule that, if the insurer pays the death benefit on a policy that lacks an insurable interest, the estate may sue to receive that benefit," pursuant to Section 2704(b) of Delaware's

18

insurable interest statute, which codified that common law cause of action and provides:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his or her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

*Malkin*, 278 A.3d at 60-61 (*quoting* Section 2704(b)).

50.    The Delaware Supreme Court further held, *inter alia*, that various UCC defenses do not apply in the context of insurable interest claims, and further explained that a defendant in such a case is allowed to obtain a credit for premiums only under limited circumstances. *Id.* at 56, 60, 63-67; *see also Estate of Barotz*, 320 A.3d 212 (Delaware Supreme Court affirming award of death benefit, plus interest, to estate where policy procured through Coventry program).

### The Application and Issuance of the Policy

51.    In or around 2005, Transamerica Life Insurance Company ("Transamerica") received an application for life insurance (the "Application") seeking a life insurance policy on the life of Mr. Dennis, who was then 78 years old.

52.    The Application identified the owner and beneficiary of the proposed policy as the Trust, a Delaware statutory trust formed under Delaware law, and acting at the direction of a Delaware trustee, Wilmington Trust, located at 1100 North Market Street, Wilmington, DE 19890.

19

53.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Application was executed by an officer for the Trust's trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office, as owner and beneficiary of the Policy.

54.    In reliance upon the representations contained in the Application, and other documents and information submitted to Transamerica in connection with the Application, Transamerica issued the Policy bearing policy number 60130474.

55.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Transamerica received a delivery receipt for the Policy executed by an officer for the Trust's trustee, Wilmington Trust, at Wilmington Trust's Wilmington, Delaware office.

### The Policy Lacked Insurable Interest and Was Procured Illegally on Mr. Dennis's Life

56.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy lacked an insurable interest at its inception, and was procured on the life of Mr. Dennis as part of a STOLI scheme in violation of, among other things, Delaware's strict constitutional, statutory, and common law prohibitions. Any appearance of insurable interest was superficial only.

57.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry (or third parties lacking an insurable interest in the Insured's life) paid the Policy's premiums; and, as will likely have

20

evidentiary support after a reasonable opportunity for further investigation or discovery, neither the Insured nor anyone else with an insurable interest in his life paid the premiums or were at risk that their funds would be used to pay the premiums.

58.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, to induce the Insured to allow the Policy to be procured on his life, Coventry and those acting on its behalf may have represented that the Policy was being procured through legitimate and legal transactions, or further induced the Insured with the promise of financial compensation if he permitted the Policy to be procured.

59.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry acted through its agent(s) to have the Application for the Policy submitted to Transamerica.

60.    To facilitate these transactions, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry created the Trust as a Delaware trust, installed Wilmington Trust as the trustee of the Trust, and used the Trust as a cover to procure the Policy without a valid insurable interest.

61.    The Trust was a sham and used as a cover because, as will likely have evidentiary support after a reasonable opportunity for further investigation or

21

discovery, it was nominally funded and created as a means to conceal from the insurance carrier the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trust lacked any valid insurable interest in the Insured's life.

62. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Coventry further created a sub-trust to the Trust. The sub-trust was also established as a mere cover to procure the Policy without a valid insurable interest.

63. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Policy was issued for delivery in Delaware to the Trust and was delivered in Delaware to the Trust, as described above.

64. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in connection with originating the Policy, Coventry, acting through LaSalle Bank, N.A., entered into a non-recourse "loan" arrangement with the Trust, with the Policy serving as the sole collateral for the purported "loan."

65. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purported "loan" was secured solely by a security interest in the Trust and sub-trust that held the Policy.

66.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, as a result of the purported "loan," neither the Insured nor anyone with an insurable interest in his life ever paid any premiums on the Policy. Rather, the loan was used to conceal from the insurance carrier the fact that such premiums were paid by Coventry for the purpose of creating wagers on the Insured's life.

67.    Moreover, as will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the purpose of the Policy was not to provide estate protection for the Insured, but rather, the Insured was used as an instrumentality to procure the Policy so that strangers with no insurable interest could wager on the Insured's early demise.

68.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, approximately two years after the Policy was issued, stranger investors unrelated to Mr. Dennis took formal control of the Policy.

69.    From the start of its involvement with the Wells Fargo Origination Agreements, Wells Fargo has known that it was participating in a STOLI operation in violation of Delaware law.

70.    From the start of its involvement with the Policy at issue here, Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable

interest. Yet, Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

71.    As noted, since 2011, when the Delaware Supreme Court issued its *Price Dawe* decision, which outlawed STOLI under Delaware law, Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable interest. Yet, Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

72.    And since 2016, multiple courts have considered the Coventry scheme under Delaware law and have unanimously concluded that Coventry operated a STOLI scheme and procured policies lacking insurable interest under Delaware law. However, since at least 2016—before the Insured passed away and Wells Fargo sought the Policy's death benefits here—Wells Fargo knew or should have known that the Policy was STOLI and lacked insurable interest. Yet Wells Fargo continued to pay premiums anyway and collected the death benefits of the Policy anyway.

73.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in a conspiracy to effectuate an illegal STOLI transaction in violation of Delaware law, Wells Fargo, its principals or agents, and/or others working in concert with it, repeatedly invaded the Insured's privacy and that of his family by contacting the Insured and his family frequently to determine whether he was still alive and, if so, to check on the status of his health.

24

74. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, in a conspiracy to effectuate an illegal STOLI transaction in violation of Delaware law, Wells Fargo, its principals or agents, and/or others working in concert with it further invaded the Insured's privacy by procuring the Insured's confidential medical records on a regular basis, and then providing those records to third parties to obtain up-to-date life-expectancy reports so as to assess the current value of its wager, as well as to allow potential purchasers to assess the value of the Policy based on when these strangers believed the Insured would die.

75. Multiple state insurance departments have condemned STOLI schemes as offending senior citizens' human dignity and as subjecting the straw insureds to various other harms, including the violation of their privacy through intrusive contact like that described above, and by misusing their private medical information to maximize their bets on the insureds' lives.

76. On March 17, 2024, Mr. Dennis passed away.

77. As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, Transamerica subsequently received claims for the Policy's death benefits by or on behalf of Wells Fargo, and thereafter paid the Policy's death benefits to Wells Fargo accordingly.

## COUNT I

25

## RECOVERY OF INSURANCE PROCEEDS DUE TO LACK OF INSURABLE INTEREST

78.    The Estate hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

79.    As will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, the Application identified the owner and beneficiary of the proposed policy as the Trust, a Delaware statutory trust formed under Delaware law and with a Delaware-based trustee. The Policy was then issued to and actually delivered to the trustee of the Trust, Wilmington Trust, in Wilmington, Delaware. For these and other reasons, the Policy is governed by Delaware law. 18 *Del. C.* § 2704(e)(4), (g).

80.    For the reasons set forth above, the Policy lacks an insurable interest. *Price Dawe*, 28 A.3d 1059; *Estate of Berland I*, 266 A.3d 964.

81.    Where an insurance company pays the death benefit on a policy lacking insurable interest, the "executor or administrator" of the insured is entitled to recover such benefits from the beneficiary, assignee, or other payee that received the benefits as a matter of common law and statute. 18 *Del. C.* § 2704 (b). *See, e.g., Estate of Berland I*, 266 A.3d 964; *Estate of Malkin I*, 379 F. Supp. 3d 1263.

82.    The Policy death benefits were paid, transferred, or otherwise assigned to Wells Fargo, its principals or agents, or others working in concert with them.

26

83.    As a consequence, the Estate is entitled to recover the death benefits (plus applicable interest, attorneys' fees, and other costs and damages) from or through Wells Fargo.

## PRAYER FOR RELIEF

WHEREFORE, the Estate respectfully requests that this Court enter judgment against Wells Fargo in an amount equal to the amount of the death benefits received plus pre-judgment interest, costs, attorneys' fees, and any such other relief as the Court deems just and proper.

**COZEN O'CONNOR**

Dated: January 12, 2026

*/s/ Nathan D. Barillo*

Kaan Ekiner (#5607)
Nathan D. Barillo (#5863)
1201 North Market Street, Suite 1001
Wilmington, Delaware 19801
(302) 295-2046/2048
kekiner@cozen.com
nbarillo@cozen.com

*Attorneys for Plaintiff,*
*The Estate of Sidney Dennis*

Nathan Barillo
1201 N. Market St.
Suite 1001
Wilmington DE 19801

**CERTIFIED MAIL**



9589 0710 5270 2684 3641 54

quadient
FIRST-CLASS MAIL
IMI
$012.14 ⁰
01/15/2026 ZIP 19801
043M31239397

US POSTAGE

Wells Fargo Bank, N.A.
101 North Phillips Avenue
Sioux Falls, SD 57104

ORIGIN ID:GPZA          (763) 795-2443
TONY SUKHA
WELLS FARGO-UTILITY SERVICES
1801 PARK VIEW DR
N9160-010 FL 01
SHOREVIEW, MN 55126
UNITED STATES US

SHIP DATE: 23JAN26
ACTWGT: 0.50 LB
CAD: 104583435/WSXI2600

BILL RECIPIENT

TO  SOP / WELLS FARGO
CORPORATION SERVICE COMPANY
1201 HAYS STREET
ATTN: SOP/WELLS FARGO
TALLAHASSEE FL 32301
(800) 927-9801
INV
PO: N9160-010                    REF: 0049099

DEPT: ESD

FedEx.
Express

E

TRK#
[0201]  3980 6328 2968

MON - 26 JAN 5:00P
STANDARD OVERNIGHT

XA TLHA                          32301
                        FL-US    TLH

261-1001

1/23/26, 1:04 PM